# EXHIBIT
# 3

UNITED STATES OF AMERICA
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN HOME ASSURANCE COMPANY,
a/s/o GENTEX CORPORATION,

        Plaintiff,

    vs.

CENTRAL TRANSPORT INTERNATIONAL,
INC.,

        Defendant.

_____/

ECF CASE

07 Civ. 7930 (CBD)

## DEPOSITION OF DAVID CHRISTOPHER RIGELHOF

The deposition of DAVID C. RIGELHOF, taken before me, PENNY E. SIDICK, Notary Public in and for the County of Oakland, acting in Macomb County, at the Holiday Inn Express, 11500 Eleven Mile Road, Warren, Michigan 48089, on Friday, June 6, 2008, at or about 8:00 a.m.

APPEARANCES:

For the Plaintiff:      JAMES J. RUDDY, ESQ. (JR-6693)
                           McDermott & Radzik, LLP
                           Wall Street Plaza
                           88 Pine Street, 21st Floor
                           New York, New York 10005
                           Telephone: (212) 376-6400

For the Defendant:      CHARLES L. HOWARD, ESQ.
                           Keenan, Cohen & Howard, P.C.
                           One Pitcairn Place, Suite 2400
                           165 Township Line Road
                           Jenkintown, Pennsylvania 19046
                           Telephone: (215) 609-1110

ALSO PRESENT: Jeffrey Cackowski

1

T A B L E    O F    C O N T E N T S

<u>WITNESS</u>                                                                    <u>PAGE</u>

DAVID CHRISTOPHER RIGELHOF


       Direct Examination by Mr. Ruddy

E X H I B I T S

                                        <u>Marked</u>      <u>Admitted</u>

       No exhibits offered

```
 1                    Warren, Michigan

 2                    Friday, June 6, 2008

 3                    At or about 8:00 a.m.

 4                              —   —   —

 5                    COURT REPORTER: Do you swear under penalty of

 6          perjury to tell the truth, the whole truth, and nothing

 7          but the truth, so help you God?

 8                    THE WITNESS: I do.

 9                D A V I D     C .    R I G E L H O F ,

10             called as a witness, testified as follows:

11                    MR. RUDDY: Okay.

12                    Mr. Howard, I notice you have Mr. Cackowski in

13          the room.

14                    MR. HOWARD: Yes, we do.

15                    MR. RUDDY: I'm going to object and ask that he

16          wait in the lobby until Mr. Rigelhof's deposition is

17          concluded.  He's a potential witness after this, and

18          he's not a principal of the corporation, and I will have

19          to object to his attending this deposition.

20                    MR. HOWARD: And it's Central's position that

21          under the rules, we're entitled to have a corporate

22          representative be present during the testimony.  He

23          certainly would fall within the officer, director, or

24          managing agent, one of those categories under the

25          Federal Rules.
```

3

```
 1                    So, we're going to -- I've asked Mr. Cackowski
 2          to be here.  He's going to be here today.
 3                    MR. RUDDY: I respectfully disagree, and I
 4          reserve all my rights
 5                    MR. HOWARD: Point taken.
 6                    MR. RUDDY: Okay.
 7                          DIRECT EXAMINATION
 8      BY MR. RUDDY:
 9      Q    Mr. Rigelhof, what's your full name?
10                    MR. HOWARD: Just so we have the same usual
11          stipulations.
12                    MR. RUDDY: Oh, the usual stipulations.
13                    MR. HOWARD: Reserve all objections, except as
14          to form until time of trial.
15                    MR. RUDDY: Okay.
16                    Mr. Rigelhof, I'll be asking you a number of
17          questions.  You have to answer verbally.  You can't
18          shake your head, because the court reporter is recording
19          everything, okay.
20                    If you don't understand the question, please
21          ask me to rephrase it.
22                    If you don't hear it, the court reporter will
23          read it back to you.  Okay?
24      BY MR. RUDDY:
25      Q    Mr. Rigelhof, what's your full name?
```

4

```
 1      A    David Christopher Rigelhof.

 2      Q    And home address?

 3      A    26357 Oakland, Roseville, Michigan.

 4      Q    Okay.  And are you presently employed?

 5      A    Yes.

 6      Q    By whom?

 7      A    Central Transport.

 8      Q    Now, is that Central Transport International?

 9      A    Yes.

10      Q    Is there also a Central Transport, Inc.?

11      A    That, I'm not sure of.

12      Q    Okay.  How long have you been employed by Central

13           Transport?

14      A    It will be six years this November.

15      Q    And in what position?

16      A    Currently, I'm a Claims Analyst.

17      Q    Okay.  And prior to being a Claims Analyst -- well, I'm

18           sorry, withdrawn.

19                    How long have you been a Claims Analyst with

20           Central Transport?

21      A    Two years.

22      Q    And prior to that, what was your job at Central

23           Transport?

24      A    I was working in the Total Traffic Department as an

25           investigator for shortages, tracking freight for various
```

```
 1              terminals in the company.
 2      Q       Okay.  Did that have anything to do with cargo claims?
 3      A       No, not as far as handling claims, no.
 4      Q       But it was related to the movement of cargo?
 5      A       Correct.
 6      Q       Okay.  Did you do that for four years, roughly?
 7      A       No.  Roughly, I did that for about two years.
 8      Q       Okay.  When you started at Central Transport, what was
 9              your first job?
10      A       I was working in the Claims Prevention Department trying
11              to find missing freight, trying to locate missing
12              freight, investigating shortages.
13      Q       Okay.  Prior to working for Central Transport, did you
14              work for anyone else?
15      A       Yes.
16      Q       Who was that?
17      A       I did contract work for General Motors, through Gonzales
18              Design.
19      Q       Okay.  And, approximately, what years did you work for
20              General Motors?
21      A       Well, it wasn't General Motors, it was Gonzales Design.
22      Q       Okay.
23      A       And that was from 1994 to 2002.
24      Q       Okay.
25              Prior to 1994, what did you do?
```

```
 1    A    I worked at Computer City, a retail store, worked for
 2         the retail store.
 3    Q    Okay.  And, just briefly, what is your educational
 4         background?
 5    A    I have some college.  I'm currently attending college.
 6    Q    Okay.  And what are you majoring in?
 7    A    Right now, it's computer science.
 8    Q    Good for you.
 9              Now, did there come a time when you became
10         involved with the claim that's in litigation?
11    A    Yes.
12    Q    Okay.  And, approximately, when was that?
13    A    Approximately, July of last year.
14    Q    How did you become involved with that?
15    A    I was given an assignment to try to reach a settlement
16         with McDermott.
17    Q    Okay.  And is that Daniel McDermott?
18    A    Correct.
19    Q    Okay.  And who gave you that assignment?
20    A    Jeff Cackowski.
21    Q    And when did you -- I'm sorry.  Do you know,
22         specifically, when you received that assignment?
23    A    No, I do not.
24    Q    Okay.  Was the assignment given orally or in writing?
25    A    Orally.
```

7

1    Q    Okay.  Basically, can you relate what he said to you and
2         what you said him?
3    A    He said that we have this claim, and that we need to
4         reach some form of agreement or a settlement.
5    Q    Okay.  Did he give you any parameters?
6    A    Not that I can recall.
7    Q    Did he discuss the nature of the claim with you at all?
8    A    Not that I can recall.
9    Q    Okay.  What, if anything, did you do then?
10   A    I contacted McDermott and tried to reach a settlement.
11   Q    Okay.  Prior to contacting McDermott, did you review the
12        file?
13   A    I went over what documents we had.
14   Q    Okay.  And that's how you got up to speed on it?
15   A    Just to see, you know, basically what happened with the
16        claim, what has been done since it was entered in our
17        system.
18   Q    Okay.  You say, what had been done up to that point.
19        Because this wasn't a new claim, it was a pending claim;
20        am I correct?
21   A    Right.
22   Q    How did you find information on this claim?
23   A    Through our imaging system.
24   Q    Okay.  And what is your imaging system?  Can you
25        describe that for me a little bit?

8

```
 1    A    Our imaging system is, when we receive documents
 2         pertaining to a claim, we will put them to an imaging
 3         system so they're stored on our computer, computer
 4         system.
 5    Q    Okay.  So, all documents for a claim are scanned into
 6         the system?
 7    A    Correct.
 8    Q    Okay.  Are E-mails put into the system?
 9    A    Usually, yes.
10    Q    Okay.  How about file notes?
11    A    If they are relevant to a claim, something that we would
12         want to reference in the future, yes, anything like
13         that, we would put on there.
14    Q    Okay.  And is each claim broken down separately in the
15         imaging system?
16    A    Yes, by the PRO number.
17    Q    Okay.  So you go to PRO number, and you find everything
18         you want about this claim?
19    A    Correct.
20    Q    Everything you have?  Okay.
21              Now, is it common in your company for more
22         than one claims handler to handle a particular claim?
23    A    Not common.
24    Q    Any reason why this claim was reassigned to you?
25    A    I was assisting the Legal Department and just trying to
```

9

```
 1              reach a resolution on this, an agreement, some form of

 2              settlement.

 3         Q    You were assisting the Legal Department and --

 4         A    Well, I was assisting -- yeah, helping Jeff, as far as

 5              reaching an agreement for the particular claim.

 6         Q    Okay.  But you said the Legal Department.  Jeff is not

 7              in the Legal Department.

 8         A    No, no, it is -- no, it was Jeff.  But it was, you know,

 9              a possible pending legal case.  So, therefore, we wanted

10              to reach some form of settlement on it.

11         Q    And when you say, Jeff, you're referring to Mr.

12              Cackowski?

13         A    Correct.

14         Q    Now, after you received instructions to try to settle

15              the case and you reviewed the file what, if anything,

16              did you do?

17         A    I contacted Dan McDermott.

18         Q    Okay.  You called him, correct?

19         A    Correct.

20         Q    And what did you say to him, and what did he say to you,

21              to the best of your recollection?

22         A    To the best of my recollection, we discussed what they

23              were requesting as far as settlement, and what was

24              previously offered, and we went back and forth with

25              different numbers to try to reach a settlement.  And
```

```
 1              from that point on, we came to an agreement on a number.
 2    Q    Okay.  And what was that number?
 3    A    $80,000.00.
 4    Q    Okay.  And did you make any notes that that was the
 5              number you came up with?
 6    A    Just in our system to -- to, you know, note the claim
 7              screen that I put on my information, that we were
 8              setting up for that much.  That we came to that
 9              agreement for that amount of money.
10    Q    Okay.
11                   MR. RUDDY: I'm going to ask your counsel to do
12              his usual good job on Plaintiff's Exhibit 1.
13    BY MR. RUDDY:
14    Q    I'd refer you to Central's document 205.
15    A    Okay.
16    Q    Did you receive that letter from Mr. McDermott?
17    A    Yes.
18    Q    Okay.  There's a notation in the upper right-hand
19              corner, "E-mailed 10/3/07."
20    A    I don't recall ever seeing that on our document, or that
21              note.
22    Q    Is that your handwriting?
23    A    No.
24    Q    Down below, there's a notation, American Home Assurance.
25                   MR. HOWARD: You mean, the handwritten --
```

```
 1                      MR. RUDDY: The handwritten item.

 2        A    Um-hum.

 3                      MR. RUDDY:   Thank you.

 4        BY MR. RUDDY:

 5        Q    Is that your handwriting?

 6        A    No.

 7        Q    Okay.  Now, when you had your discussions with Mr.

 8             McDermott, was there any negotiation involved in the

 9             settlement for $80,000.00?

10                      MR. HOWARD: Object to the form, but you can

11             answer.

12        A    Yes, we tried to reach a settlement with a -- with a

13             dollar amount.

14        BY MR. RUDDY:

15        Q    Did you -- did he ask for more, and did you offer less?

16        A    Yes.

17        Q    Do you remember what he asked for?

18        A    I -- to the best of my knowledge, I believe he started

19             off with around $100,000.00.  And then I went down to

20             $75,000.00.  He came back with $85,000.00.  We agreed on

21             $80,000.00.

22        Q    Okay.  What else did you say during that discussion, if

23             anything?

24        A    Nothing that I can recall.  Just, basically, discussing

25             the dollar amount of the settlement.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Do you know what day that discussion was? |
| 2 | A | I don't recall the exact date. |
| 3 | Q | Did you make any notes regarding that? |
| 4 | A | No. |
| 5 | Q | Did you memorialize your settlement agreement with Mr. |
| 6 | | McDermott in any form?  Do you know what memorialize |
| 7 | | means?  It means put it in writing somehow, record it. |
| 8 | A | Just on our claim screen, I noted that we reached a |
| 9 | | settlement of $80,000.00. |
| 10 | Q | Okay.  And -- I'm sorry, what -- in what document did |
| 11 | | you -- |
| 12 | A | Our claim screen. |
| 13 | Q | Claim screen. |
| 14 | A | Um-hum.  That's where we input information pertaining to |
| 15 | | claims. |
| 16 | Q | I'd like you to look at Central 224.  Is that the |
| 17 | | document you're referring to? |
| 18 | A | Yes, that's a screen capture of our claim screen. |
| 19 | Q | Okay.  And what do you mean by a screen -- screen of |
| 20 | | your claims?  A screen capture, did you say? |
| 21 | A | Yes, capture.  A print-out of the claim screen. |
| 22 | Q | Okay.  And what's the purpose of a claim screen? |
| 23 | A | To enter information regarding claims. |
| 24 | Q | Okay.  The information on 224, was that all entered by |
| 25 | | you? |

13

```
 1    A    Not all of it.  I amended some notes, per my discussions
 2         with Mr. McDermott, but there were previous comments on
 3         there.
 4    Q    Okay.  What information did you personally place on this
 5         screen?
 6    A    The paid amount.
 7    Q    Okay.
 8    A    I changed the status.
 9    Q    Okay.
10    A    And I noted the comments here, dated August the 1st,
11         that there was a settlement for a lawsuit against CTII,
12         and I noted their mailing address.
13    Q    Okay.  So, on -- and do you know what date you placed
14         these comments on here?
15    A    From this, it appears it was August the 1st.
16    Q    Okay.  Now, under your comments, it says,
17              "8/1, settlement for lawsuit against CTII."
18    A    Correct.
19    Q    What does that mean?
20    A    That means that we have reached an agreement, and that
21         this would be the settlement amount.
22    Q    Okay.  And what does the next sentence say?
23    A    "Mailed to McDermott & Radzik, LLP, Wall Street Plaza,
24         89 Pine Street, New York, New York 10005."
25    Q    And what does that mean?
```

14

1    A    That would be their mailing address.

2    Q    Okay. And that was where you were going to mail the

3          check?

4    A    If one was -- yes, if it was received, then it would

5          have been -- if it would have been issued, then it would

6          have been sent to them.

7    Q    Now, current status, right above that.

8    A    Um-hum.

9    Q    Did you enter that?

10    A    Yes.

11    Q    Okay. And you did that at 8/1/2007 at 3:53 p.m.?

12    A    Correct.

13    Q    Okay.

14                And what does it mean by "paid and check

15          issued"?

16    A    It means that settlement has been reached, and that this

17          claim should be paid in this amount, and that a check

18          should be issued.

19    Q    Okay. But -- okay.

20                To your knowledge, was this check ever issued?

21    A    No.

22    Q    Why not?

23    A    Because I had to go through an approval process based on

24          the dollar amount, and that was rejected.

25    Q    Does this screen indicate anywhere that you needed

1           approval for this settlement?

2      A    No, it's just known knowledge within the company that

3           for a certain dollar amount, over a certain amount, that

4           it has to -- it's pending approvals.

5      Q    Well, under current status, what other notation could

6           you have put in there, besides "paid and check issued"?

7      A    There really would not -- at the time, there would not

8           have been any additional information internally that we

9           would need.

10     Q    Well, could you have put in settlement subject to

11          approval?

12     A    That's just known that when it's based over a dollar

13          amount, that it is subject for approval.

14     Q    And what is that dollar amount?

15     A    $1,200.00.

16     Q    Did you advise Mr. McDermott that you only had authority

17          up to $1,200.00?

18     A    No, I did not.

19     Q    Did you advise Mr. McDermott that you needed approval

20          for this settlement?

21     A    I do not recall.

22     Q    Did there come a time when you sought authority for this

23          settlement?

24     A    No.  I didn't seek authority.  I set it up for payment

25          and left it from there.

16

| | | |
|---|---|---|
| 1 | Q | Okay. Did you have any discussions with anyone within |
| 2 | | CTI regarding the proposed settlement? |
| 3 | A | I believe, after our discussions on the phone that we |
| 4 | | reached the settlement, that I passed the word on to |
| 5 | | Jeff orally, I recall. I -- to the best of my |
| 6 | | knowledge, I think something happened like that. |
| 7 | Q | Would this -- how closely situated are you to Mr. |
| 8 | | Cackowski in the office? |
| 9 | A | He sits in the office right behind me. |
| 10 | Q | Okay. Do you speak to him every day? |
| 11 | A | Yes. |
| 12 | Q | Okay. On or about August 1, 2007, did you discuss this |
| 13 | | settlement with him? |
| 14 | A | I don't recall. |
| 15 | Q | Do you recall when you first discussed this settlement |
| 16 | | with him? |
| 17 | A | I don't recall the exact date. |
| 18 | Q | Do you recall telling him you settled it for $80,000.00? |
| 19 | A | I believe so. |
| 20 | Q | And what was his reply, if you recall? |
| 21 | A | I don't recall his response. |
| 22 | Q | What happened next with respect to this case? You made |
| 23 | | the entry on August 1? |
| 24 | A | Um-hum. From there, a voucher was issued. I received a |
| 25 | | copy of that voucher, and I attached a copy of our claim |

17

1    screen with the bill of lading and signed off on it, and
2    then it went to Jeff's office.
3    Q    Okay.  When you talk about a voucher, are you referring
4    to Central 223?
5    A    Correct.
6    Q    Okay.  Who prepared that?
7    A    That is something prepared by our Accounts Payable
8    Department.
9    Q    And where would they get the information?
10   A    From the claim screen.
11   Q    From the claim --
12   A    It would be generated from the claim screen.
13   Q    Okay.  Now, this claim screen, when you prepared your
14   notes, is it directed to anyone in particular, or
15   anybody can just pull it up whenever they want?
16   A    I believe anyone in the company internally, if they have
17   access, I believe is how they'd be able to pull it up.
18   Q    Okay.  And what did you do next?
19   A    After signing off and giving it to Jeff, that was it.
20   Q    Okay.  Did you prepare any sort of recommendation for
21   the $80,000.00 figure?
22   A    Are you --
23   Q    What I'm saying is, you put in on the screen, settled
24   for $80,000.00.  Did you give any reasons for why that
25   was a reasonable or an unreasonable settlement?

18

```
1    A    No, I just basically indicated, I believe, that that's
2         the settlement amount that we agreed upon.
3    Q    Okay.  Prior to your discussions with Mr. McDermott, do
4         you recall what documents you reviewed to enable you to
5         discuss the settlement?
6    A    I don't recall exactly what documents it was.
7    Q    Well, generally, what would you review?
8    A    Likely, the bill of lading, the inspection report, any
9         pictures that may have pertained to the freight.  That
10        would be about it.
11   Q    Are you familiar with a company known as US?
12   A    Yes.
13   Q    And who are they?
14   A    Universal Tracking Services.
15   Q    And what are they?
16   A    They are, or were, at least, a customer of ours.
17   Q    Okay.  Were they a freight broker; do you know?
18   A    I believe so, but I'm not sure.
19   Q    Okay.  Do you know if Central Transport has contracts
20        with any customers of yours?
21   A    With any customer?
22   Q    Yes.
23   A    Yes, with certain customers, they do have contracts.
24   Q    And did they have a contract with Universal?
25   A    That, I am not sure of --
```

                                19

```
1        Q    Well --
2        A    -- at the time.
3        Q    -- if there was a contract, would that be a document
4             that you would have reviewed in connection with
5             resolving this claim?
6        A    No.
7        Q    Why not?
8        A    Because I was given instructions to try to reach a
9             settlement based on what was previously offered with our
10            company and what they were requesting.
11       Q    What do you mean, what was previously offered?
12       A    From the offer -- when Jeff was handling the claim, from
13            that offer.
14       Q    Okay.  So your instructions were to try to settle it for
15            something between the claim amount and above $50,000.00,
16            right?  Is that what you're saying?
17       A    Correct.
18       Q    Okay.
19       A    Correct.
20       Q    Now, referring to Central 205, did you read that letter?
21       A    Yes.
22       Q    Okay.  What's your understanding of the first paragraph?
23       A    That it confirms our telephone conversation.
24       Q    Okay.
25            "in which we agreed to settle the above referenced
```

```
 1              claim in the sum of $80.000.00."
 2      A    Yes.
 3      Q    Okay.  Did you respond in any fashion to that letter?
 4      A    No.
 5      Q    Did you call Mr. McDermott?
 6      A    From that point on, no.
 7      Q    Okay.
 8      A    That I can recall.
 9      Q    Okay.  After you submitted the $80,000.00 voucher, what
10           happened next?
11      A    Nothing, as far as with me with the claim.  That was all
12           I did to handle it.
13      Q    Well, did there come a point in time when the claim was
14           rejected -- the settlement was rejected by CTI?
15      A    Directed through me?
16      Q    Well, when did you learn that the settlement was not
17           approved by CTI?
18      A    I don't recall the exact date.
19      Q    Okay.  How did you learn it?
20      A    I heard from Jeff.
21      Q    Okay.  Tell me the circumstances of that.  Where was
22           this conversation?
23      A    In his office, I believe.
24      Q    Okay.  And what did he say to you, and what did you say
25           to him?
```

21

| | | |
|---|---|---|
| 1 | A | That the offer for $80,000.00 was being rejected. |
| 2 | Q | Did he give you any reasons why? |
| 3 | A | Not that I can recall. |
| 4 | Q | Did you ask why? |
| 5 | A | Not that I can recall. |
| 6 | Q | Did you make any notes to the file that the offer was |
| 7 | | rejected? |
| 8 | A | Not that I can recall. |
| 9 | Q | After you put in your 8/1 note saying that the case was |
| 10 | | settled for $80,000.00, did you make any further notes |
| 11 | | to the file? |
| 12 | A | Not that I can recall. |
| 13 | Q | After July 31, 2007, did you have any further |
| 14 | | discussions with Mr. McDermott? |
| 15 | A | Not that I can recall. |
| 16 | Q | Did you have any further discussions with anyone after |
| 17 | | July 31 concerning this claim, other than Mr. Cackowski? |
| 18 | A | I don't believe so. |
| 19 | Q | So, when you settled this claim with Mr. McDermott, did |
| 20 | | you take into account any potential limitations of |
| 21 | | liability? |
| 22 | A | No, not that I can recall. |
| 23 | Q | Are you familiar with the term, limitation of liability? |
| 24 | A | Yes. |
| 25 | Q | What does that mean in trucking industry regarding -- |

22

```
 1    A    What our liability would be limited to on a claim.
 2    Q    Okay.  And did you have any indication that CTI was
 3         entitled to any limitation of liability?
 4    A    At the time, I did not consider it because I was
 5         instructed to try to reach a settlement between two
 6         dollar amounts.
 7    Q    Okay.  Sir, I'm going to show you a letter from Mr.
 8         McDermott to yourself, dated August 15, 2007, and it's
 9         attached to Plaintiff's 5.
10              Did you receive that letter?
11    A    I believe so, but I do not recall seeing any of this
12         writing on here, the handwritten writing.
13    Q    Okay.  If you did receive that letter, what would you
14         have done with it?
15    A    I likely would have imaged it to our imaging system.
16    Q    Okay.  Would you have shown it to Mr. Cackowski?
17    A    I don't recall if I did or not.
18    Q    Okay.  And could you read that letter.
19    A    Yes.
20              "Dear Mr. Rigelhof:
21              "We refer to our letter of July 31st, 2007, in
22              which we confirmed our agreement to settle this
23              claim in the sum of $80,000.00.  Please advise when
24              we may expect settlement funds.
25              "Many thanks."
```

```
 1     Q    Did you respond in any fashion to that letter?

 2     A    I don't believe so.

 3     Q    If you had responded in writing, would you have a record

 4          of that?

 5     A    Yes.

 6     Q    And where would that be?

 7     A    In our imaging system.

 8     Q    Okay.  Have you checked the file recently in the imaging

 9          system?

10     A    No, not recently.

11     Q    When was the last time you looked at it?

12     A    I don't recall.

13     Q    Within the last six months?

14     A    I don't recall.  I don't -- I don't believe so.

15     Q    Do you recall Mr. McDermott calling you subsequent, or

16          on August 15th regarding this letter?

17     A    No, I don't recall.

18     Q    Do you recall ever telling him that the check will be in

19          the mail on Tuesday?

20     A    No, I don't recall that.

21     Q    Sir, I'd like to show you a letter dated August 30,

22          2007, which is attached to Plaintiff's Exhibit 5.  It's

23          addressed to you, and ask if you recall receiving that

24          letter?

25     A    No, I do not recall this letter.
```

24

```
 1      Q    If you had received it, would it have gone into the
 2           file?
 3      A    Yes, it would have.
 4      Q    In the normal course of business?
 5      A    Correct.
 6      Q    Does the company keep any record of income faxes?
 7      A    Not that I am aware of.
 8      Q    Okay.
 9                If you had received this letter, would you
10           have responded to it orally, or in writing?  Please read
11           it.
12      A         "Dear Mr. Rigelhof:
13                "We refer to our letters of July 31st and August
14                15th, 2007, and our phone conferences.  We still
15                have not received settlement funds in the sum of
16                $80,000.00, despite your assurance that the check
17                was processed and being mailed out.  Please refer
18                settlement funds as soon as possible to avoid a
19                suit of breach of an agreed settlement.
20                "Thank you for your immediate attention to this
21                matter."
22      Q    Do you recall ever seeing that letter?
23      A    Seeing this letter?
24      Q    Now that you've read it, yes.  Does that refresh your
25           recollection?
```

```
1    A    No, it does not.
2    Q    Okay.  If you had received that letter, would you have
3         responded orally, or in writing?
4    A    I likely --
5              MR. HOWARD: Object to form.  You can answer.
6    A    I likely would have called Mr. McDermott.
7    BY MR. RUDDY:
8    Q    Okay.  Is it possible you called him and told him that
9         it had been referred to the Legal Department?
10   A    I don't recall.
11   Q    Okay.  At any point in time, did you orally advise Mr.
12        McDermott that the settlement was not approved?
13   A    I don't believe so.
14   Q    At any point in time, did you advise Mr. McDermott in
15        writing that the settlement was not approved?
16   A    No, I don't believe so.
17   Q    Why not?
18   A    Because it was out of my hands.  It was now in my
19        supervisor's office.  I did what I was assigned to do,
20        and passed it on to him.
21   Q    Your supervisor is Mr. Cackowski?
22   A    Correct.
23   Q    Now, sir, in dealing with claims, do you have some
24        familiarity with broker/carrier agreements?
25   A    Yes.
```

```
 1    Q    Okay.  Are they normally drafted or prepared by the
 2         Claim Department?
 3    A    I don't believe so.  No, not that I can --
 4    Q    Do you know what department would prepare them in your
 5         company?
 6    A    I'm not sure what department that is.
 7    Q    Okay.  Might it be the Pricing Department?
 8    A    I believe it could be, yes.  I believe it could be the
 9         Pricing Department.
10    Q    Okay.  Does the Claim Department have any input
11         whatsoever, to your knowledge, in preparing these
12         agreements?
13    A    Not to my knowledge.
14    Q    Sir, I'd just like to refer you back to document 223,
15         the voucher.  There's handwriting in the lower right-
16         hand corner.
17    A    Um-hum.
18    Q    Do you recognize that?
19    A    Yes.
20    Q    What is it?
21    A    That's my signature.
22    Q    Okay.
23    A    And the date.
24    Q    Okay.  Why would you sign it?  What's the purpose of
25         your signing this?
```

```
1    A    I received this voucher from our Accounts Payable
2         Department.  It's generated from our claim screen.  And
3         I sign off on it.  And from there, it goes into Jeff's
4         office.
5    Q    Okay.  You signed off on it on August 13?
6    A    Yes.
7    Q    Okay.  That's approximately two weeks after the
8         agreement was reached, correct?
9    A    Yes.
10   Q    What caused the delay, if you recall?
11   A    Well, it could take time for this print out, for it to
12        generate in our system.  And then from there, I
13        sometimes received multiple of -- multiple vouchers, and
14        I tried to get to them as soon as possible to sign off
15        on them.  So, that was likely just not -- I did not get
16        to it until a few days after I received it, likely.
17   Q    I'd like to refer you now to Central's document 219,
18        it's the Settlement Agreement.
19                   Mr. Rigelhof, do you recognize Central's
20        document 219?  Take your time and read it.
21   A    Okay.
22                   I don't recall seeing this document.
23   Q    Did you prepare this document?
24   A    No.
25   Q    Do you know who prepared this document?
```

28

```
 1    A    If it were prepared, I would believe it would be by our

 2         Legal Department, by Will Lindleyi.

 3              MR. HOWARD: Do you know who prepared it?

 4    A    I believe it would be Will Lindleyi.

 5    BY MR. RUDDY:

 6    Q    Okay.  Do you know when he prepared it?

 7    A    No.

 8    Q    Do you know --

 9              MR. HOWARD: Object to the form, it

10         mischaracterizes.  He said he believes that Will

11         prepared it.

12              MR. RUDDY: Okay.

13              MR. HOWARD:  He doesn't know that Will

14         prepared it.

15    BY MR. RUDDY:

16    Q    But it comes from Central's file.  Let's leave a space

17         in the transcript, and would you fill in who prepared it

18         and when it was prepared?

19    A    I do not know for certain who prepared it, or when it

20         was prepared.

21    Q    I'm asking you to go back to the office and find out,

22         with the assistance of Mr. Howard.

23    A    Okay.

24              MR. HOWARD: We'll certainly take the request

25         under advisement.  It was who prepared it and when it
```

```
 1            was prepared?
 2                     MR. RUDDY: Correct.
 3       BY MR. RUDDY:
 4       Q    Sir, have you ever seen a settlement agreement and
 5            release like this before?
 6       A    No, I have not.  Not that I can recall.
 7       Q    It's not a usual form used by Central, to your
 8            knowledge?
 9       A    To my knowledge, no, it's not.
10       Q    In your experience with Central, have you settled claims
11            over the years?
12       A    Yes.
13       Q    Cargo claims, correct?
14       A    Um-hum.
15       Q    I'm sorry.  When you deal with claims, is it strictly
16            cargo claims?
17       A    Yes.
18       Q    Okay.  And when a settlement is done with Central what,
19            if any, documents do you require from the claimant?
20       A    We require an invoice, various cases, if it's a damage
21            claim --
22       Q    No, I'm sorry.  I mean, once the settlement is reached
23            --
24       A    Once the settlement --
25       Q    -- do you require a release?
```

30

```
 1    A    I do not, no.  No.

 2    Q    Okay.  Does -- do you prepare a release for the

 3         claimant?

 4    A    No.

 5    Q    So, in a normal settlement, you just mail on a check at

 6         some point?

 7    A    If the check is cut, then, yes, it would be mailed.

 8    Q    But prior to the check being cut, do you require

 9         anything else from the claimant?

10    A    No, once liability is established, or in case -- in case

11         an agreement is reached, however it works, then I go

12         through the process of setting up the payment to the

13         claims screen.

14    Q    So, after you reach an agreement with a claimant, you

15         normally have no additional contact with them?

16    A    Usually, correct.

17    Q    Sir, document 219 through 222.  I'm sorry.

18              Do you know if this document was in your

19         imaging system?

20    A    I don't believe it was.  I don't recall seeing it.

21    Q    Okay.  Do you know if there's a Page 5 to this?

22    A    If there's a Page 5?  I don't know.

23    Q    Well --

24    A    I don't see one here.

25    Q    Okay.  Do you see any place for it to be signed by
```

31

```
 1              Central?
 2         A    No, not to be signed by Central.
 3         Q    You don't see a place for it?
 4         A    For Central to sign?
 5         Q    Right.
 6         A    No.  No, I do not.
 7         Q    Okay.  I would ask that you search the file in the
 8              office and see if there is additional pages to this
 9              release, and to provide any and all copies of additional
10              pages.
11                   By the way, Plaintiff's Exhibit 2, can you
12              tell me what that document is?
13         A    This is a bill of lading.
14         Q    In fact, the bill of lading for this particular
15              shipment?
16         A    It appears it is, yes.
17         Q    Other than Mr. Cackowski and Mr. McDermott, did you ever
18              discuss this claim with anyone else, other than Mr.
19              Howard?
20         A    No, not that I can recall.
21         Q    Okay.  Did you have any written communications regarding
22              this claim with anyone -- I'm sorry, other than the
23              screen capture and the voucher request?
24         A    No, I do not believe so.
25         Q    Do you recall telling Mr. McDermott that you needed
```

```
 1              approval for this settlement?

 2      A       I don't recall.

 3      Q       Now, regarding any of your telephone discussions with

 4              Mr. McDermott, did you make any notes to the file, other

 5              than the one of August 1, on the screen capture?

 6      A       Not that I can recall, no.  I don't believe so.

 7      Q       If you would have had discussions with him on other

 8              days, would you have made notations?

 9      A       Likely, I would have.

10      Q       Is that company policy to memorialize each and every

11              telephone discussion regarding a claim?

12      A       If it's relevant to the claim or any form of settlement,

13              we would make notes to the claim screen.

14      Q       When the claim was rejected finally, did you make any

15              notes to the file?

16      A       No, not that I can recall.  No.

17      Q       Okay.  So, you're not sure when you found out that it

18              was rejected then?

19      A       Yeah, I don't recall.

20      Q       Does CTI have any documents whatsoever showing that the

21              claim was -- the settlement was not approved?

22      A       No, I don't think so.

23                       MR. RUDDY: Give me two minutes to review your

24              file, and I might let you go back to work.

25                       THE WITNESS: Okay.
```

33

```
 1                         (Short pause.)

 2                         MR. RUDDY: I have no further questions at this

 3             time.

 4                         THE WITNESS: Okay.

 5                         MR. HOWARD: I have no questions either.

 6                         MR. RUDDY: All right.  We're finished.  We

 7             appreciate it.

 8                         I have nothing for Mr. Cackowski.

 9                         MR. HOWARD: Okay.

10                         (Proceedings concluded at or about 8:47 a.m.)

11                                   -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF COURT REPORTER

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF OAKLAND )

       I certify that this transcript, consisting of 35 pages, is a complete, true, and correct record of the testimony of DAVID RIGELHOF, held in this case on Friday, June 6, 2008.

       I also certify that prior to taking this deposition, DAVID RIGELHOF was duly sworn to tell the truth.

       I also certify that I am not a relative or employee of or an attorney for a party; or a relative or employee of an attorney for a party; or financially interested in the action.

PENNY E. SIDICK (CER-4039)
Tappert Court Reporting Service, Inc.
26600 Schoenherr
Warren, Michigan 48089
Telephone: (586) 447-3800

Dated: June 6, 2008.

35