# EXHIBIT A



# SUBROGATION RECEIPT

**Claim No. 0069567-A**                                          **Date: 02/09/2007**

Received from American Home Assurance Company the sum of One hundred twelve thousand four hundred and ninety nine dollars and 38/100 ($112,499.38) in full settlement of our claim under Policy Number 87854 issued by the said Insurance Company, for damage to and loss of the property as described below, shipped on board RTWB495-288534-1 sailing from ZEELAND, MI to SAN DIEGO, CA ; on or about 05/25/2006

    In consideration of this payment, we hereby guarantee that we are the persons entitled to enforce the terms of the contracts of transportation set forth in the bills of lading covering the said property; and we agree that the said Insurance Company is subrogated to all of our rights of recovery on account of any and all such loss or damage from the carriers and from any other vessels, persons or corporations that may be liable therefor, including municipal corporations and governments, and we agree to assist the said Insurance Company in effecting such recovery; and we hereby authorize the said Insurance Company in effecting such recovery; and we hereby authorize the said Insurance Company to file claims and begin suit against any such carrier, vessel, person, corporation or government in our names, and we hereby appoint the officers and agents of said Insurance Company and their successors, severally, our agents and attorneys in fact, with irrevocable power to collect any and all such claims and to begin, prosecute, compromise or withdraw, either in our name or in the name of said Insurance Company, but at the expense of said Insurance Company, any and all legal proceedings which they may deem necessary to enforce such claim or claims, including proceedings before any international tribunal, and to execute in our names any documents which may be necessary to carry into effect the purpose of this agreement. We further agree to execute any documents which may be necessary to enable the said Insurance Company to proceed in accordance herewith, including any and all pleadings and releases which said Insurance Company may request us to execute; and we agree that any moneys collected from any such carrier, vessel, person, corporation or government, whether received in the first instance by the undersigned or by the said Insurance Company, shall be the property of said Insurance Company.

    The payment receipted for herein is accepted with the understanding that said payment shall not inure to the benefit of any carrier under the provisions of any contract of carriage or otherwise; that in making the payment the said Insurance Company does not waive any rights by subrogation or otherwise against any carrier or bailee; and that the acceptance of this receipt shall not prejudice or take away any such rights or remedies which the said Insurance Company would otherwise have by virtue of such payment.

Co

By:

Title: Vice President-Finance and Treasurer

Date: February 16, 2007

**DESCRIPTION OF PROPERTY:**
MACHINERY

SS: RTWB495-288534-1
B/L#: 495-288534-1
VOYAGE: ZEELAND, MI TO SAN DIEGO, CA

**CAUSE AND APPROXIMATE DATE OF LOSS:**
MACHINERY DAMAGED IN TRANSIT
05/

AI MARINE ADJUSTERS, INC.

MAR 8 - 2007

RECEIVED

To: Jim Nass

From: Silma Ho

# EXHIBIT B

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4  --------------------------------x

5  AMERICAN HOME ASSURANCE COMPANY

6  a/s/o GENTEX CORPORATION,

7

8                  Plaintiff,

9

10         vs.                    No. 07-CV-7930(CBD)

11

12  CENTRAL TRANSPORT INTERNATIONAL,

13  INC.,

14

15                  Defendant.

16  --------------------------------x

17

18

19

20          DEPOSITION OF JAMES T. NASSO

21              New York, New York

22          Thursday, June 12, 2008

23

24  Reported by:

     Yaffa Kaplan

25  Job No. 218278

Page 6

```
 1              Nasso
 2 So other than that, I don't think it should be too
 3 long.  I don't have that many questions in the
 4 first place, so.
 5       Have you ever been deposed before?
 6   A.  Yes, I have.
 7   Q.  Many times or --
 8   A.  Four, five.
 9   Q.  So you kind of know what's going on?
10   A.  Yes.
11   Q.  Are you right now under the influence of
12 any sort of medication or anything that impairs
13 your ability today?
14   A.  No.
15   Q.  I kind of had to ask.
16       When you did these depositions before,
17 what were they about?
18   A.  Mostly transit related except for one
19 was property related.
20   Q.  And when you say transit related, what
21 did you mean by that?
22   A.  Ocean cargo or, you know, warehousing
23 and things like that.
24   Q.  It was a subrogation claim?
25   A.  Yes, it was a subrogation claim.
```

Page 7

```
 1              Nasso
 2   Q.  And of course the other thing is you
 3 can't say "uh-uh" or nods, just so Ms. Kaplan can't
 4 take that down.
 5       So to appear here today, did you receive
 6 a notice of deposition?
 7   A.  Yes.
 8   Q.  What I am going to do is I am going to
 9 give a copy to the reporter and then I guess as she
10 marks it, she will give it to you.
11       (Defendant's Exhibit 1, notice of
12       deposition, marked for identification, as of
13       this date.)
14   Q.  And, sir, any exhibit that I give you,
15 you are more than welcome to read over it, take
16 your time and then, you know, answer questions.  If
17 you need to take a few minutes, let me know.  I
18 don't want to rush you along.
19   A.  Okay.
20   Q.  What was marked as Defendant's Exhibit
21 1, is that a copy of the notice that you received?
22   A.  Yes.
23   Q.  When you received it, did you have an
24 opportunity to look through it?
25   A.  Yes, I did.
```

Page 8

```
 1              Nasso
 2   Q.  And understand what was being asked of
 3 you?
 4   A.  Yes, I did.
 5   Q.  When you got that notice, did you look
 6 through any documents to prepare yourself?
 7   A.  Just through the file.
 8   Q.  When you say just "through the file,"
 9 what is your file?  What does your file have, what
10 is in it?
11   A.  Claim documents.  They are claim
12 documents from the subrogation file.
13   Q.  And when you say claim documents, are
14 these documents you generated or how are these
15 documents generated?
16   A.  These are documents given to the claims
17 adjuster and then sent to us for subrogation.
18   Q.  Who is the claims adjuster?
19   A.  Mark Schumaker.
20   Q.  Who does Mark work for?
21   A.  He worked for AI Marine Adjusters.
22   Q.  And that's who you work for also?
23   A.  That's correct.
24   Q.  And besides the claims documents you
25 looked at, did you look at anything else?
```

Page 9

```
 1              Nasso
 2   A.  No.
 3   Q.  Did you speak to anyone to prepare for
 4 today's deposition?
 5   A.  Just the attorney.
 6   Q.  And when you spoke to your attorney, you
 7 don't have to tell me what was said, but how long
 8 did you take to prepare for this deposition?
 9   A.  Half an hour.
10   Q.  Was that today or a previous day?
11   A.  Yesterday.
12   Q.  In that half an hour, were you shown any
13 documents or given any documents to get ready?
14   A.  Yes.  Yes, I was shown documents that he
15 had.
16   Q.  And what were those documents?
17   A.  What was in the file that I had
18 originally given him.
19   Q.  Just so it's in the file that you have,
20 the claims from Mark -- what did you say Mark's
21 last name was?
22   A.  Schumaker.
23   Q.  Schumaker.  Are those the only documents
24 you looked at?
25   A.  Yes, that's correct.
```

3 (Pages 6 to 9)

Page 10

1          Nasso
2    Q.   What is actually in the documents, are
3 they sort of e-mails?  What's contained in it?
4    A.   They are e-mails, there are
5 transportation documents, and subrogation
6 information that I have now.
7    Q.   These e-mails, who are they from or
8 between?
9    A.   E-mails between myself, Central
10 Transport, there are e-mails from Mark Schumaker to
11 the insured.  And e-mails between a broker and
12 our -- myself and Central Transport.
13   Q.   When you say "insured," who are you
14 talking about?
15   A.   Gentex Corporation.
16   Q.   And when you say "broker," who are you
17 speaking about?
18   A.   UTS.
19   Q.   Then you said there are some
20 transportation documents?
21   A.   That's correct.
22   Q.   What are those documents?
23   A.   May I look in the file?
24   Q.   Yes, please.
25   A.   There is a bill of lading from Central

Page 11

1          Nasso
2 Transport.  There is a quote from Autosplice.
3    Q.   Is that a quote for replacement or for
4 an original machine?
5    A.   This is a quote for -- it looks like a
6 replacement, yes.  And that's it.
7    Q.   Now, you said you spoke to your
8 attorney.  Besides your attorney, did you speak to
9 anybody else about any information you needed to
10 learn for today's deposition?
11   A.   No.
12   Q.   Did you see on Exhibit 1, I guess it's
13 about the fourth page in, Schedule A?
14   A.   I see it.
15   Q.   And there are about six things mentioned
16 in Schedule A.  Are you familiar with all six of
17 those topics?
18   A.   Let me read that.
19   Q.   Sure.
20   A.   The first one, no.
21   Q.   And that first one says "Condition of
22 shipment and origin and the identity of all
23 individuals with personal knowledge of the same."
24 You are unfamiliar with that?
25   A.   That's correct.

Page 12

1          Nasso
2    Q.   Did you do any research or speak to
3 anyone to learn about that topic?
4    A.   No.
5    Q.   Were you asked to do that?
6    A.   No.
7        MR. RUDDY:  Excuse me, but there may be
8    some miscommunication here.  If your question
9    relates did he ever personally see the
10   machine, no; but he has seen the documents,
11   like the bill of lading for instance.  So I am
12   not sure -- he quite understands, I am just
13   trying to clarify, he is familiar with, you
14   know, transportation claims, but did he ever
15   see the machinery, no.
16   Q.   Okay.  And did you -- just to follow up
17 on what Mr. Ruddy said, did you speak to anyone who
18 came in contact with the machinery?
19   A.   No.
20   Q.   Besides number 1, are you familiar with
21 all the other five topics?
22   A.   Again, personally never saw the
23 machinery or, you know, spoke to anyone with the
24 personal knowledge of the machinery.
25   Q.   And why is that?  Is there a reason why

Page 13

1          Nasso
2 you didn't speak to someone with personal knowledge
3 of the machinery?
4    A.   Because what we do, we get the
5 subrogation claim after the adjuster adjusts it and
6 then we claim against, you know, the liable
7 carrier.  We don't have to discuss the loss with
8 the insured because it's already been adjusted.
9    Q.   Do you know who would be able to talk
10 about topics, let's say 1 and 2, which is the
11 condition of the shipment at origin?
12   A.   Condition of the shipment at origin
13 would be the insured.
14   Q.   And would you know the -- let's say the
15 name of a person who would be able to do that?
16   A.   No, I don't.
17   Q.   And is that, the same true for number 2,
18 which is the condition of the shipment at
19 destination and identity of individuals?
20   A.   I would think the insured also would be
21 the one to contact on that.
22   Q.   But you yourself, sir, have not
23 personally done that?
24   A.   No.
25   Q.   Now number 3, the computation of damages

4 (Pages 10 to 13)

**Esquire Deposition Services**
**(215) 988-9191**

Page 26

1           Nasso
2 do exactly?
3    A.   I have to look through the file.  I
4 don't know.
5    Q.   This machine was being sent to
6 California for some sort of upgrade?
7    A.   Yes, it was.
8    Q.   What kind of upgrade was it being sent
9 for?
10   A.   I don't know.
11   Q.   Do you know how often this machine had
12 to be upgraded?
13   A.   No, I don't.
14   Q.   Do you know if this machine had ever
15 been upgraded in the past?
16   A.   I don't.
17   Q.   Do you know what kind of condition the
18 machine was in before it was shipped?
19   A.   I don't.
20   Q.   Do you know who would know the answer to
21 the last four, five questions I just asked?
22   A.   The insured.
23   Q.   But, and again kind of beating a dead
24 horse, you did not speak to anybody from the
25 insured regarding those matters?

Page 27

1           Nasso
2    A.   I did not.
3    Q.   Once the shipment arrives or the machine
4 arrives in California, it's inspected by King or
5 surveyed by King, is that what you said earlier?
6    A.   After the damage?
7    Q.   After the damage.
8    A.   He was hired to survey the damages.
9    Q.   And who hired him?
10   A.   Our adjuster in Chicago.
11   Q.   Now, you, sir, did not have any
12 correspondence with Mr. King?
13   A.   No, I didn't.
14   Q.   Besides a report that he generated, do
15 you have any sort of documentation or reports from
16 him?
17   A.   No, I don't.
18        MR. RUDDY:  Excuse me.  When you say
19   "you," do you mean addressed to him personally
20   or does the file contain any letters or
21   correspondence or e-mails from Mr. King?
22   Q.   When I say "you," I mean you personally,
23 and also in your file as the person who speaks, I
24 guess, on behalf of your company.
25   A.   Okay, there are e-mails from Gary King

Page 28

1           Nasso
2 in the file.
3    Q.   Okay.
4    A.   But you had asked if I had any personal
5 contact with Gary King; no.
6    Q.   And the answer was no to that?
7    A.   Yes.
8    Q.   I'm sorry, I should have clarified.  The
9 few questions I asked before regarding -- and I
10 will go back a step, regarding how the machine was
11 packaged or what the machine did or how often it
12 had been updated, when I say do you have any
13 knowledge, do you as the representative for your
14 company have any knowledge about those items?
15   A.   No.
16   Q.   And not just you individually, but as
17 the representative?
18   A.   That's correct.  I don't believe we
19 would have any of that information from the insured
20 about when it's upgraded, how many times, things
21 like that, no.
22   Q.   And again, from here on out any time I
23 say "you," I also mean as the representative for
24 your company, just so it's clear.
25   A.   Okay.

Page 29

1           Nasso
2    Q.   And also, you don't know how it was
3 packed or any of those things?
4    A.   I don't, no.
5    Q.   I want to show you the next exhibit, I
6 think it's 3.
7        (Defendants' Exhibit 3, letter from the
8    surveying company hired by AI Marine to the
9    insured, with copies to the adjuster and the
10   broker, marked for identification, as of this
11   date.)
12   Q.   Sir, do you know what Exhibit 3 is?
13   A.   May I read it?
14   Q.   Yes, please.
15   A.   It's a letter from the surveying company
16 hired by AI Marine to the insured, with copies to
17 our adjuster and the broker.
18   Q.   When I earlier spoke about a surveying
19 report by Mr. King, is there anything besides this
20 letter that -- in terms of a report, this letter,
21 Exhibit 3?
22   A.   May I look through the file?
23   Q.   Sure, please.
24        MR. RUDDY:  I'm sorry, would you repeat
25   the last question.

8 (Pages 26 to 29)

Page 30

Nasso

1
2    (Record read.)
3    MR. RUDDY:  Are you talking about
4    e-mails or letters?
5    Q.    Just a report, just a document generated
6    about the loss?
7    A.    Only e-mails.  There is no report.
8    Q.    Okay.  Now in Exhibit 3, on page 2, in
9    the middle of the page there are about 11 I guess
10   questions or requests asked of the insured.  Do you
11   see those?
12   A.    I do.
13   Q.    Do you know if that information was
14   provided to Mr. King?
15   A.    I don't know.
16   Q.    And do you know the answers to those
17   questions, and I will go one at a time, question
18   number 1, "Load conformation, booking order,
19   shipping instructions issued by Gentex Corporation
20   to UTS"?
21   A.    I'm sorry, repeat the question.
22   Q.    Sure.  Do you see question number 1,
23   where it asks for a load confirmation or booking
24   order and shipping instructions?  Do you know if
25   that was provided to the insured?

Page 31

Nasso

1
2    A.    I would have to look through the file.
3    Q.    Sure.
4    You know what, let me ask you this a
5    different way.  Do you, and "you" again being a
6    representative from the company, know what those
7    instructions were or what the confirmation is, what
8    the booking order is?
9    A.    Booking order is confirmation of the
10   trucker, you know, getting the cargo and shipping
11   it, you know, to the final destination.  It's the
12   piece of paper that, you know, shows that.
13   Q.    And have you seen that piece of paper?
14   A.    I believe it's the bill of lading in the
15   file.
16   Q.    And is that the same as the shipping
17   instructions or are there separate shipping
18   instructions?
19   A.    I don't know that.
20   Q.    What about load confirmation?  Is there
21   a separate piece of paper or is that the bill of
22   lading again?
23   A.    I believe the bill of lading.
24   Q.    Question 2, "What is the life expectancy
25   of the machine and how it's determined."  Do you

Page 32

Nasso

1
2    know, you being the representative, know the answer
3    to that question?
4    A.    It may be in the file.  I don't know.
5    Q.    I guess the next two questions are also
6    related to the same thing, so before we look
7    through your file, we will try that.  "How many
8    hours has the equipment been in operation?"  Do you
9    know the answer to that?
10   A.    I don't.
11   Q.    What about "The current book value or
12   the actual cash value of the machine"?
13   A.    Maybe in the file, in e-mail.
14   Q.    Could you please look for that, please?
15        MR. RUDDY:  Do you mind if I help him?
16        MR. KURIAN:  No, not at all.
17        We are going to mark Mr. Nasso's file as
18   Exhibit 4.
19        (Defendant's Exhibit 4, Mr. Nasso's
20   file, marked for identification, as of this
21   date.)
22        (Recess taken.)
23        MR. KURIAN:  Just to clarify, we are
24   going to mark a copy of Ms. Nasso's file as
25   Exhibit 4 and then when Mr. Nasso refers to a

Page 33

Nasso

1
2    particular document within Exhibit 4, we will
3    mark it with the letter to follow; is that
4    fair?
5        MR. RUDDY:  Would it be simpler if you
6    used his original file for questioning and he
7    used the individual pages?
8        MR. KURIAN:  Yes.
9 BY MR. KURIAN:
10   Q.    Now, sir, Exhibit 4, which is your file,
11   was that made or is that in response to Schedule B
12   of the notice in Exhibit 1?
13   A.    Yes, it is.
14   Q.    And Schedule 2 of Exhibit 1, there are
15   no other documents that are outstanding to produce
16   to me, are there?
17   A.    No.
18   Q.    And, sir, just so it's fair, we will go
19   back a little bit.  When you earlier said you, as
20   yourself personally or as a representative, didn't
21   know how this machine was packed, looking through
22   your file now, would you be able to answer that
23   question?
24   A.    I would.
25   Q.    What's the answer to the question?

9 (Pages 30 to 33)

Page 34

Nasso

1  A.  The machine was packed in a wooden
3 crate.
4  Q.  And where was that packed at?
5  A.  At I believe the insured's premises on
6 loading, the loading area.
7  Q.  Do you know where that is?
8  A.  I believe it's in Michigan.
9  Q.  When I say how it's packed, do you know
10 what the actual procedure is or what -- how were --
11 what materials are used, how it's done?
12  A.  No, I don't.
13  Q.  And referring to your file doesn't
14 answer that specific question?
15  A.  I don't believe it does.
16  Q.  And Exhibit 4, your file, does not, or
17 does it contain any information as to who did the
18 actual packing?
19  A.  I have to look through the file.
20  Q.  Please.
21    (Record read.)
22  Q.  Sir, if you know, that's --
23  A.  The file does not indicate who did the
24 actual packing.
25  Q.  Do you know what the current book value

Page 35

Nasso

2 or the actual value for the machine is?
3  A.  I have to look through the file.
4    MR. KURIAN:  Do you understand the
5 question?  Because he said current.
6    You don't mean today obviously?
7  Q.  At the time of the claim, and again
8 "you" meaning you as the representative.
9  A.  According to an e-mail in the file, the
10 invoice value is $246,000.  A current replacement
11 cost would be $305,785.
12    MR. KURIAN:  Can we mark that as Exhibit
13 4A, that e-mail that you referred to.
14    (Defendant's Exhibit 4A, e-mail
15 regarding the invoice value and current
16 replacement value, marked for identification,
17 as of this date.)
18  Q.  Now, the value quoted in 4A is the price
19 as it was purchased for, correct?
20  A.  Yes, it was.
21  Q.  And the purchase was back in 2003?
22  A.  I don't know that.
23  Q.  My question is, do you know what the
24 actual value of the machine was, I guess right
25 before it got damaged?  Does that question make

Page 36

Nasso

2 sense?
3  A.  No, it doesn't.
4  Q.  The machine obviously is not the same
5 value as when it was purchased in 2003, right?
6  A.  Right, that's correct.
7  Q.  So there was a value assigned to the
8 machine as time goes on, right?
9  A.  Correct.
10  Q.  Do you know what that value was right
11 before the damage to the machine?
12    MR. RUDDY:  Are you asking him what the
13 depreciated value was?
14  Q.  Yes, the depreciated value?
15  A.  The depreciated value, I have that in
16 the file.
17    MR. RUDDY:  Just to keep the record
18 straight, we have to remember that the machine
19 consisted of more than one piece, the head
20 assemblies, and head assemblies were not
21 damaged.  Are you asking for the depreciated
22 value of the machine which was subsequently
23 damaged?
24    MR. KURIAN:  Just the damaged machine.
25    MR. RUDDY:  Just the damaged product,

Page 37

Nasso

2 okay.  So let's clarify.  The damaged part was
3 not valued at 246, it was only 249 --
4 actually, let's go off the record for a
5 second.
6    (Discussion off the record.)
7    MR. RUDDY:  We are looking at the claim
8 presentation and the entire machine was worth
9 $246,880.  However, the damaged portion of the
10 machine, excluding the head assemblies, which
11 were not damaged, that piece of the machine
12 was purchased for $208,380.
13    MR. KURIAN:  We will mark that as 4B.
14    (Defendant's Exhibit 4B, document
15 regarding the claim presentation, marked for
16 identification, as of this date.)
17  Q.  4B does not contain the depreciated
18 value of the machine that was damaged, correct?
19  A.  Correct.
20  Q.  And do you know what that value is?
21  A.  Yes, I do.
22  Q.  What is that value?
23  A.  The depreciated value was $87,499.57.
24    MR. RUDDY:  We have got to clarify.
25    MR. KURIAN:  I will clarify.

10 (Pages 34 to 37)

Page 50

```
1                   Nasso
2    Q.  The only other number mentioned to you
3  was 80,000?
4    A.  That's correct.
5    Q.  And not higher either?  Not 100,000?
6    A.  There is a letter in here indicating
7  that I was copied in again, July 20, 2007, where he
8  went back to Central Transport and I authorized him
9  to go back and ask for a hundred thousand dollars.
10   Q.  And that's my next question.  It's by
11 your authority?
12   A.  That's correct.
13   Q.  So the three numbers mentioned are
14 50,000, 80,000 and a hundred thousand?
15   A.  That's correct.
16   Q.  Those are the only numbers mentioned?
17   A.  That's correct.
18   Q.  And those are the only numbers that you,
19 sir, authorized?
20   A.  That's correct.
21   Q.  And by authorization, I mean terms of
22 negotiation, not authorized to settle?
23   A.  Well, there is an e-mail dated 7/7 --
24 I'm sorry, July 20, 2007, where I said, "You are
25 authorized to conclude this on best terms above the
```

Page 51

```
1                   Nasso
2  $50,000."
3    Q.  So any number over $50,000 would have
4  been okay?
5    A.  That's correct.
6    Q.  55,000?
7    A.  Best terms.
8    Q.  Only because I don't know what that
9  means.
10   A.  55.
11   Q.  55, now, would have been okay?
12   A.  It's a compromise.  It's a compromise,
13 but I wouldn't have accepted 55.  I gave him
14 authorization for better than 50, but I would have
15 thought it would have been higher than 55.
16   Q.  So if it was 55, Mr. McDermott would
17 have to come back to you?
18   A.  That is correct.
19   Q.  So the authorization e-mail that you
20 sent was not a blank authorization?  He still would
21 have to come back to you?
22   A.  Correct.
23   Q.  Okay.
24       Anything about this negotiation process
25 and the questions that I asked you that you didn't
```

Page 52

```
1                   Nasso
2  have an answer or opportunity to answer, or that
3  you left out some important part?
4    A.  No.
5    Q.  That's all the information?
6    A.  Yes.
7    Q.  Okay, just making sure.
8        Now, sir, I want to show you what I will
9  mark as D 6.
10       (Defendant's Exhibit 6, subrogation
11    receipt, marked for identification, as of this
12    date.)
13   Q.  Sir, are you familiar with that
14 document?
15   A.  Yes, I am.
16   Q.  What is that document?
17   A.  It's a subrogation receipt.
18   Q.  What is your understanding of
19 subrogation and subrogation receipt?
20   A.  Subrogation receipt is issued to the
21 insured and signed by the insured, giving us the
22 subrogated rights to the loss that we just paid.
23   Q.  Does that include the responsibility
24 of -- that includes all the responsibilities that
25 also belong with that right?
```

Page 53

```
1                   Nasso
2    A.  Yes, that's correct.
3    Q.  And finally I want to show you what I
4  will mark as D 7.
5        (Defendant's Exhibit 7, letter to James
6    Nasso from Jeff Cackowski, from Central
7    Transport, marked for identification, as of
8    this date.)
9    Q.  Sir, are you familiar with that
10 document?
11   A.  Yes, I am.
12   Q.  How are you familiar with it?
13   A.  I received that on the -- looks like the
14 18th of April, 2007.
15   Q.  That's a letter to you from Jeff
16 Cackowski, from Central Transport?
17   A.  That's correct.
18   Q.  In that letter, Mr. Cackowski asks for
19 three different -- there are three different
20 questions he asked for, including the complete
21 breakdown of the amount, for the claim amount;
22 second, the reason the unit was being returned; and
23 third, whether the unit was shipped in a used
24 condition.  Did you respond to Mr. Cackowski
25 regarding this letter?
```

14 (Pages 50 to 53)

# EXHIBIT C

*BILL OF LADING* (handwritten)

**STRAIGHT BILL OF LADING - SHORT FORM - Original - Not Negotiable**

RECEIVED, subject to the classifications and lawfully filed tariffs in effect on the date of the issue of this Bill of Lading.

The property described below at apparent (good order, except as noted (contents and condition of packages unknown), marked, consigned, and destined as indicated below, which said carrier agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination, it is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all of the bill of lading terms and conditions in the governing classification on the date of shipment.

**SINGLE SHIPMENT PICKUP** ☐

| CARRIER NO. | |
| --- | --- |
| DATE | 5/25/2006 |

| FROM: Origin | TO: Destination |
| --- | --- |
| GENTEX CORP - CENTENNIAL | AUTOSPLICE INC |
| STREET | STREET |
| 800 N CENTENNIAL | 10121 BARNES CANYON |
| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
| KEELAND | MI | 49464 | SAN DIEGO | CA | 92121 |

*RMA# 060204* (handwritten)

| CONTACT: Jerry Cassidy 772-1990 x4976 | CONTACT: RMAS 060204 |
| --- | --- |

BILL TO: ☒ GENTEX CORP - CENTENNIAL    P.O. Box 888470, Grand Rapids, MI 49588-8470

| NUMBER SHIPPED UNITS | HM | DESCRIPTION OF ARTICLES, SPECIAL MARKS AND EXCEPTIONS | NMFC ITEM | Class | WEIGHT (SUBJECT TO CORRECTION) |
| --- | --- | --- | --- | --- | --- |
| 1 Crate | | Machinery and Machine Parts; Machinery NOI * | 1333000- | 85 | 4366 |
| | | | | | |
| | | *Central Transport Scales* (handwritten, circled) | | | |
| 2 | | TOTALS | | / | 4366 |

72x58x79 and 37x33x35
ESTIMATED WEIGHT

        SO#: CO52506

-- INSPECT FOR QUALITY & QUANTITY BEFORE SIGNING. NOTE ALL VISIBLE DAMAGE/SHORTAGE/MISHANDLING AT DELIVERY

*CTR* (handwritten)

| REMIT C.O.D. TO/Address: | | FREIGHT CHARGES: |
| --- | --- | --- |
| 495-288534-1    B/L | Subject to Section 7 of the conditions, if shipment is to be delivered to the consignee without recourse on the shipper, the consignor shall sign the following statement: The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. _____ (Signature of shipper) | FREIGHT PREPAID Except when box at bottom is checked. Charges are to be COLLECT when box is checked. ☐ |
| NOTE: Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____ | C.O.D. FEE PREPAID ☐ COLLECT ☐ | COD AMT: |

| This is to certify that the above named materials are properly classified, described, packaged, marked, and labeled and are in proper condition for transportation, according to the applicable regulations of the D.O.T. | CARRIER [signature] |
| --- | --- |
| SHIPPER GENTEX CORP - CENTENNIAL | PER [signature] |
| PER    Sue Kelly/KSB | DATE 5-25-06    TIME 4:15 PM    PIECES 2 |

Shipper hereby certifies that he is familiar with all the Bill of lading terms and conditions in the governing classifications and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN HOME ASSURANCE
COMPANY
a/s/o GENTEX CORPORATION,

                             Plaintiff,

                 -against-

CENTRAL TRANSPORT
INTERNATIONAL, INC.,

                      Defendant.

CIVIL ACTION

NO.: 07-CV-7930(CBD)

**NOTICE OF DEPOSITION**
**PURSUANT TO FED. R. CIV. P.**
**30(b)(6)**

       PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), the

Defendant herein will take the deposition of plaintiff, American Home Assurance

Company a/s/o Gentex Corporation (the "Plaintiff"), at 9:30 am, on June 12, 2008, and

continuing day to day until complete, at the offices of McDermott & Radzik, LLP, Wall

Street Plaza, 88 Pine Street, New York, NY, 10005, before an official court reporter

authorized by law to administer oaths.

       The purpose of the deposition will be to inquire into those subject matters

specified in Schedule A, attached hereto. Plaintiff shall designate one or more of its

officers, directors, or managing agents, or other persons who consent to testify on its

behalf to testify about those matters identified on Schedule A. Plaintiff shall provide the

undersigned counsel with reasonable notice, in advance of the deposition, of the

identity(ies) of the individual(s) who will testify. Pursuant to Fed. R. Civ. P. 30(b)(2) and



34, the individual(s) so designated by Plaintiff shall bring with him or her the documents identified on Schedule B hereto.

KEENAN COHEN & HOWARD P.C.

By:    _____

Charles L. Howard
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Telephone:    (215) 609-1110
Facsimile:    (215) 609-1117

Attorneys for Defendant
Central Transport International, Inc.

Dated: May 5, 2008

## CERTIFICATE OF SERVICE

I, Charles L. Howard, hereby certify that, on May 5, 2008, a true and correct copy of the foregoing Second Amended Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) and Schedules A and B thereto were served *via* first class mail, postage prepaid, upon the following:

James J. Ruddy, Esquire
Mc DERMOTT & RADZIK, LLP
Wall Street Plaza
88 Pine Street
New York, New York 10005

*Attorneys for Plaintiff*

By:   _____
        Charles L. Howard

## SCHEDULE A – MATTERS FOR EXAMINATION

The terms "Shipment" and "Settlement" shall have the same meaning as those terms are used in the Amended Complaint filed by the Plaintiff herein.

1.    The condition of the Shipment at origin and the identity of all individuals with personal knowledge of same;

2.    the condition of the Shipment at destination and the identity of all individuals with personal knowledge of same;

3.    the computation of all damages allegedly sustained by the Shipment and the identity of all individuals with personal knowledge of same;

4.    the preparation of the Shipment for transportation to destination, including, but not limited to, the loading of the Shipment into the trailer in which it was shipped;

5.    the negotiations between plaintiff and defendant which you allege resulted in a Settlement of the claims herein; and

6.    the terms and conditions of the Settlement which you allege plaintiff and defendant entered into.

## **SCHEDULE B**

1.  All documents which Plaintiff identified, produced or referred to in its disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii) and (iii).

2.  All documents not previously produced which relate, refer or pertain to the topics identified in Schedule A hereto.

# EXHIBIT E

LEXSEE 2001 U.S. DIST. LEXIS 20637

**JOHN L. SABRE, et al., Plaintiffs, -against- FIRST DOMINION CAPITAL, LLC, et al., Defendants.**

**01 Civ. 2145 (BSJ)(HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 20637; 51 Fed. R. Serv. 3d (Callaghan) 1405*

**December 10, 2001, Decided
December 12, 2001, Filed**

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Methods > Stipulations*
[HN1] See *Fed. R. Civ. P. 30(d)(2)*.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN2] For purposes of the durational limit, the deposition of each person designated under *Fed. R. Civ. P. 30(b)(6)* should be considered a separate deposition.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN3] A deposition pursuant to *Fed. R. Civ. P. 30(b)(6)* is substantially different from a witness's deposition as an individual. A *Fed. R. Civ. P. 30(b)(6)* witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN4] For purposes of calculating the number of a depositions in a case, a *Fed. R. Civ. P. 30(b)(6)* deposition is separately counted as a single deposition, regardless of the number of witnesses designated. As a separate deposition that probes the knowledge of the entity and not the personal knowledge of the individual testifying, a *Fed. R. Civ. P. 30(b)(6)* deposition should be subject to its own independent 7-hour limit.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN5] The *Fed. R. Civ. P. 30(b)(6)* deposition of an witness is a separate deposition from the deposition of that same person as an individual witness and is presumptively subject to a separate, independent 7-hour time limit.

**COUNSEL:**    [*1]    For JOHN L. SABRE, ALEXANDER L. BOLEN, ANDREW H. MARSHAK, MICHAEL A. MONTELEONE, plaintiffs: Thomas M. Campbell, Smith Campbell, L.L.P., New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

*MEMORANDUM OPINION AND ORDER*

PITMAN, United States Magistrate Judge:

In correspondence dated November 29, December 3 and December 4, 2001, the parties dispute whether the presumptive seven-hour time limit set forth in *Fed.R.Civ.P. 30(d)(2)* applies cumulatively to the testimony given by a witness in both his individual capacity and as a corporate representative pursuant to *Fed.R.Civ.P. 30(b)(6)* or whether the individual deposition and the 30(b)(6) deposition are subject to independent seven-hour presumptive time limits. For the reasons set forth below, I conclude that the latter interpretation is correct and that the depositions of an individual who is noticed as an individual witness pursuant to *Fed.R.Civ.P.*

Case 1:07-cv-07930-GBD    Document 33-2    Filed 08/27/2008    Page 21 of 29

Page 2

2001 U.S. Dist. LEXIS 20637, *; 51 Fed. R. Serv. 3d (Callaghan) 1405

*30(b)(1)* and who is also produced as a corporate representative pursuant to *Fed.R.Civ.P. 30(b)(6)* are presumptively subject to independent seven-hour time limits.

*Fed.R.Civ.P. 30(d)(2)* provides that [HN1] "unless otherwise authorized by the court or stipulated [*2] by the parties, a deposition is limited to one day of seven hours." The 2000 Advisory Committee Notes to this amendment provide that "for purposes of this durational limit, [HN2] the deposition of each person designated under *Rule 30(b)(6)* should be considered a separate deposition."

[HN3] A deposition pursuant to *Rule 30(b)(6)* is substantially different from a witness's deposition as an individual. A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity. 8A Charles A. Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice & Procedure* § 2103 (2d ed. 1994). The distinct status of a 30(b)(6) deposition is confirmed by the Advisory Committee Notes to the 1993 amendments to the Federal Rules of Civil Procedure which expressly state that [HN4] for purposes of calculating the number of a depositions in a case, a 30(b)(6) deposition is separately counted as a single deposition, regardless of the number of witnesses designated. As a separate deposition that probes the knowledge of the entity and not the personal knowledge of the individual testifying, [*3] a 30(b)(6) deposition should be subject to its own independent seven-hour limit.

If defendants' interpretation were correct, and a person who is both an individual witness and a 30(b)(6) witness were presumptively subject to a single seven-hour deposition there would be substantial potential for over-reaching. For example, any entity that wanted to limit the testimony of an individual could accomplish that goal by designating the individual as a 30(b)(6) wit-

ness; under defendant's interpretation, every minute spent conducting the 30(b)(6) deposition would be deducted from the time available to probe the witness's individual knowledge. Conversely, defendants' interpretation would also permit an entity to curtail 30(b)(6) examinations by designating as a 30(b)(6) witness a person who previously testified for six-hours as an individual and has only one hour left on his or her presumptive seven-hour clock. An interpretation that would lead to such absurd results must be rejected.

This is not to say, however, that the inquiring party has *carte blanche* to depose an individual for seven hours as an individual and seven hours as a 30(b)(6) witness. In the case of many closely held corporations, [*4] the knowledge of an individual concerning a particular subject also constitutes the total knowledge of the entity. In such a situation, the witness could simply adopt the testimony he or she provided in a former capacity, thereby obviating the need for a second deposition. In addition, if the questioning at any deposition becomes repetitive or is otherwise being conducted in an oppressive manner, the aggrieved party can always make application for a protective order.

Accordingly, I conclude that [HN5] the 30(b)(6) deposition of an witness is a separate deposition from the deposition of that same person as an individual witness and is presumptively subject to a separate, independent seven-hour time limit.

Dated: New York, New York

December 10, 2001

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

129JNR

********** Print Completed **********

Time of Request: Wednesday, August 27, 2008  10:37:06 EST

Print Number:    1862:110403021
Number of Lines: 90
Number of Pages:

Send To:  HOWARD, CHARLES
          KEENAN COHEN & HOWARD
          165 TOWNSHIP LINE RD. SUITE 2400
          JENKINTOWN, PA 19046

129JNR

**Time of Request:** Wednesday, August 27, 2008  10:37:06 EST
**Client ID/Project Name:** 1847.119
**Number of Lines:** 90
**Job Number:**     1862:110403021

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2001 U.S. Dist. LEXIS 20637

**Send to:**  HOWARD, CHARLES
            KEENAN COHEN & HOWARD
            165 TOWNSHIP LINE RD. SUITE 2400
            JENKINTOWN, PA 19046

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY a/s/o GENTEX CORPORATION, | CIVIL ACTION |
| Plaintiff, | NO.: 07-CV-7930(CBD) |
| -against- | **NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)** |
| CENTRAL TRANSPORT INTERNATIONAL, INC., | |
| Defendant. | |

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), the Defendant herein will take the deposition of plaintiff, American Home Assurance Company a/s/o Gentex Corporation (the "Plaintiff"), at 9:30 am, on June 12, 2008, and continuing day to day until complete, at the offices of McDermott & Radzik, LLP, Wall Street Plaza, 88 Pine Street, New York, NY, 10005, before an official court reporter authorized by law to administer oaths.

The purpose of the deposition will be to inquire into those subject matters specified in Schedule A, attached hereto. Plaintiff shall designate one or more of its officers, directors, or managing agents, or other persons who consent to testify on its behalf to testify about those matters identified on Schedule A. Plaintiff shall provide the undersigned counsel with reasonable notice, in advance of the deposition, of the identity(ies) of the individual(s) who will testify. Pursuant to Fed. R. Civ. P. 30(b)(2) and

34, the individual(s) so designated by Plaintiff shall bring with him or her the documents

identified on Schedule B hereto.

                              **KEENAN COHEN & HOWARD P.C.**

                         By: _Charles L. Howard_____
                              Charles L. Howard
                              One Pitcairn Place, Suite 2400
                              165 Township Line Road
                              Jenkintown, PA 19046
                              Telephone:    (215) 609-1110
                              Facsimile:    (215) 609-1117

                              Attorneys for Defendant
                              Central Transport International, Inc.

Dated: May 5, 2008

## CERTIFICATE OF SERVICE

I, Charles L. Howard, hereby certify that, on May 5, 2008, a true and correct copy

of the foregoing Second Amended Notice of Deposition Pursuant to Fed. R. Civ. P.

30(b)(6) and Schedules A and B thereto were served *via* first class mail, postage prepaid,

upon the following:

> James J. Ruddy, Esquire
> Mc DERMOTT & RADZIK, LLP
> Wall Street Plaza
> 88 Pine Street
> New York, New York 10005
>
> *Attorneys for Plaintiff*
>
> By: _____
> Charles L. Howard

## SCHEDULE A – MATTERS FOR EXAMINATION

The terms "Shipment" and "Settlement" shall have the same meaning as those terms are used in the Amended Complaint filed by the Plaintiff herein.

1.    The condition of the Shipment at origin and the identity of all individuals with personal knowledge of same;

2.    the condition of the Shipment at destination and the identity of all individuals with personal knowledge of same;

3.    the computation of all damages allegedly sustained by the Shipment and the identity of all individuals with personal knowledge of same;

4.    the preparation of the Shipment for transportation to destination, including, but not limited to, the loading of the Shipment into the trailer in which it was shipped;

5.    the negotiations between plaintiff and defendant which you allege resulted in a Settlement of the claims herein; and

6.    the terms and conditions of the Settlement which you allege plaintiff and defendant entered into.

## SCHEDULE B

1.  All documents which Plaintiff identified, produced or referred to in its

    disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii) and (iii).

2.  All documents not previously produced which relate, refer or pertain to the

    topics identified in Schedule A hereto.